CONTINENTAL BAKING CO. ET AL. *v.* WOODRING, GOVERNOR, ET AL.

No. 677.   Argued April 25, 1932.—Decided May 23, 1932.

354

*Messrs. Charles R. Wilke* and *John C. Grover,* submitted for appellants.

*Mr. Walter T. Griffin,* with whom *Messrs. Roland Boynton,* Attorney General of Kansas, *Charles W. Steiger,* and *Earl H. Hatcher* were on the brief for appellees.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

This is an appeal from a final decree of the District Court, composed of three judges as required by statute, which dismissed, on motion, the bill of complaint in a suit brought to restrain the enforcement of the Motor Vehicle Act of Kansas. Laws of 1931, c. 236; *Continental Baking Co.* v. *Woodring*, 55 F. (2d) 347.

Plaintiffs are "private motor carriers of property," operating bakeries in Kansas and other States and making deliveries to their customers by their own trucks. They contend that the statute, by reason of the obligations it imposes, and of its classifications, violates the due process and equal protection clauses of the Fourteenth Amendment, the provision as to the privileges and immunities of citizens (Art. IV, § 2), and the commerce clause (Art. I, § 8, par. 3), of the Federal Constitution.

The statute relates to motor vehicles, comprehensively defined, when used upon any public highway of the State for the purpose of transporting persons or property. It applies to those who are engaged in such transportation as "public motor carriers" of property and passengers, "contract motor carriers" of property and passengers, and "private motor carriers of property." "Public motor carrier" means one transporting "for hire as a common carrier having a [*sic*] fixed termini or route." "Contract motor carrier" of property means one who is not a "public motor carrier" and is engaged in transportation "for hire as a business." "Private motor carrier of property" means one transporting "property sold or to be sold by him in furtherance of any private commercial enterprise." § 1.[1] The Act does not apply

---

[1] "Section 1 (a). The term 'motor vehicle' when used in this act means any automobile, automobile truck, trailer, motor bus, or any other self-propelled or motor-driven vehicle used upon any public

to (1) motor carriers operating wholly within any city or village of the State, (2) private motor carriers operating within a radius of twenty-five miles beyond the corporate limits of such city or village, (3) the transportation of livestock and farm products to market "by the owner thereof or supplies for his own use in his own motor vehicle," and (4) the transportation of children to and from school. § 2.[2] Public motor carriers are declared to be common carriers within the meaning of the public utility laws of the State and subject to regulation accord-

---

highway of this state for the purpose of transporting persons or property. (b) The term 'public motor-carrier of property' when used in this act shall mean any person engaged in the transportation by motor vehicle of property for hire as a common carrier having a [sic] fixed termini or route. (c) The term 'contract motor carrier of property' when used in this act shall be construed to mean any person not a public motor carrier of property engaged in the transportation by motor vehicle of property for hire as a business. (d) The term 'private motor carrier of property' when used in this act shall be construed to mean any person engaged in the transportation by motor vehicle of property sold or to be sold by him in furtherance of any private commercial enterprise. (e) The term 'public motor carrier of passengers' when used in this act shall mean any person engaged in the transportation by motor vehicle of passengers or express for hire as a common carrier having a fixed termini or route. (f) The term 'contract motor carrier of passengers' when used in this act shall be construed to mean any person not a public motor carrier of passengers engaged in the transportation by motor vehicle of passengers or express for hire. (g) The term 'public highway' when used in this act shall mean every public street, road or highway or thoroughfare of any kind used by the public."

[2] " Sec. 2. That this act shall not apply to motor carriers who shall operate wholly within any city or village of this state, or private motor carriers who operate within a radius of twenty-five miles beyond the corporate limits of such city, or any village, nor to the transportation of livestock and farm products to market by the owner thereof or supplies for his own use in his own motor vehicle; or to the transportation of children to and from school."

ingly, including that of rates and charges. § 3.[3] Public motor carriers, contract motor carriers, and private motor carriers of property are forbidden to operate motor vehicles for compensation on any public highway except in accordance with the provisions of the Act. § 4.[4] The public service commission is vested with supervision of these carriers in all matters affecting their relationship "with the traveling and shipping public" and, specifically, to prescribe regulations in certain particulars hereinafter mentioned. § 5.[5] All transportation charges made

---

[3] "Sec. 3. All 'public motor carriers of property or passengers' as defined in this act are hereby declared to be common carriers within the meaning of the public utility laws of this state, and are hereby declared to be affected with a public interest and subject to this act and to the laws of this state, including the regulation of all rates and charges now in force or that hereafter may be enacted, pertaining to public utilities and common carriers as far as applicable, and not in conflict herewith."

[4] "Sec. 4. No public motor carrier of property or passengers, contract motor carrier of property or passengers or private motor carrier of property shall operate any motor vehicle for the transportation of either persons or property for compensation on any public highway in this state except in accordance with the provisions of this act."

[5] "Sec. 5. The public service commission is hereby vested with power and authority and it shall be its duty to license, supervise and regulate every public motor carrier of property or of passengers in this state and to fix and approve reasonable maximum or minimum or maximum and minimum rates, fares, charges, classifications and rules and regulations pertaining thereto. And the public service commission is hereby vested with power and authority and it shall be its duty to license, supervise and regulate every public motor carrier of property or of passengers, contract motor carrier of property or of passengers and private motor carrier of property in the state and to regulate and supervise the accounts, schedules, service and method of operation of same; to prescribe a uniform system and classification of accounts to be used; to require the filing of annual and other reports and any other data; and to supervise and regulate 'public

by public motor carriers must be just and reasonable. § 6. Public motor carriers in intrastate commerce must obtain certificates of convenience and necessity. § 7. Contract motor carriers and private motor carriers of property " either in intrastate commerce or in interstate commerce " must obtain licenses. Application therefor must give information as to ownership, financial condition and equipment, and such further facts as the public service commission may request. The commission is required, upon receipt of this information and on compliance with the regulations and payment of fees, to issue a license. § 8.[6] In addition to license fees, public motor carriers, contract motor carriers, and private motor carriers of property must pay a tax of " five-tenths mill per gross ton mile," computed in the manner described, for the administra-

motor carriers of property or of passengers,' ' contract motor carriers of property or of passengers ' and ' private motor carriers of property,' in all matters affecting the relationship between such ' public motor carriers of property or of passengers,' ' contract motor carriers of property or of passengers ' and ' private motor carriers of property ' and the traveling and shipping public. The public service commission shall have power and authority by general order or otherwise to prescribe reasonable and necessary rules and regulations governing all such motor carriers. All laws relating to the powers, duties, authority and jurisdiction of the public service commission over common carriers are hereby made applicable to all such motor carriers except as herein otherwise specifically provided."

[6] " Sec. 8. It shall be unlawful for any ' contract motor carrier of property or passengers ' or ' private motor carrier of property ' to operate as a carrier of property or passengers within this state either in intrastate commerce or in interstate commerce without first having obtained from the public service commission a license therefor. An application shall be made to the public service commission in writing stating the ownership, financial condition, equipment to be used and physical property of the applicant, and such other information as the commission may request. Upon receipt of such information and on compliance with the regulations and payment of fees, the public service commission shall issue a license to such applicant."

tion of the Act and for the maintenance and reconstruction of the public highways. § 13.[7] Every motor carrier covered by the Act must keep daily records, upon prescribed forms, of all vehicles used and must certify under oath summaries showing the ton miles traveled monthly and such other information as the commission may require. § 15.[8] The commission is empowered to enforce the provisions of the Act and to inspect the books and documents of all carriers to which the Act applies. § 16.[9]

[7] " Sec. 13. In addition to the regular license fees or taxes imposed upon ' public motor carriers of property or of passengers,' ' contract motor carriers of property or of passengers,' and ' private motor carriers of property,' there shall be assessed against and collected from every such carrier a tax of five-tenths mill per gross ton mile for the administration of this act and for the maintenance, repair and reconstruction of the public highways. The said gross ton mileage shall be computed: (a) The maximum seating capacity of each passenger carrying vehicle shall be estimated at 150 pounds per passenger seat; to this sum shall be added the weight of the vehicle, the total shall then be multiplied by the number of miles operated, and the amount thus obtained divided by 2,000; (b) 200 per cent of the rated capacity of each property carrying vehicle plus the weight of the vehicle shall be multiplied by the number of miles the vehicle is operated, and the amount thus obtained divided by 2,000."

[8] " Sec. 15. Every motor carrier to which this act applies shall keep daily records upon forms prescribed by the commission of all vehicles used during the current month. On or before the 25th day of the month following, they shall certify under oath to the commission, upon forms prescribed therefor, summaries of their daily records which shall show the ton miles traveled during the preceding month, and such other information as the commission may require. . . ."

[9] " Sec. 16. The commission is hereby empowered to administer and enforce all provisions of this act, to inspect the books and documents of all carriers to which this act applies, and to expend such amount of the sum collected hereunder as is necessary for such purposes upon requisition by the commission to the state auditor: *Provided, however,* The total sum to be expended as provided in this section shall not exceed during the calendar year twenty per cent of the total gross sum collected under this act. . . ."

Of the moneys received under the provisions of the Act twenty per cent. is to be applied to administration and enforcement and the remainder is to be placed to the credit of the State's highway fund. § 18.[10] No certificate or license is to be issued by the commission to any of the described motor carriers until a liability insurance policy approved by the commission has been filed " in such reasonable sum as the commission may deem necessary to adequately protect the interests of the public with due regard to the number of persons and amount of property involved, which liability insurance shall bind the obligors thereunder to pay compensation for injuries to persons and loss of or damage to property resulting from the negligent operation of such carrier." No other or additional bonds or licenses than those prescribed in the Act are to be required by any city or town or other agency of the state. § 21.[11] The commission may pro-

---

[10] " Sec. 18. All moneys received under the provisions of this act shall be distributed: (a) For administration and enforcement of the provisions of this act, twenty per cent shall be held by the state treasurer for the use of the public service commission; (b) the balance the said treasurer shall place to the credit of the highway fund of the state and it shall become a part thereof."

[11] " Sec. 21. No certificate or license shall be issued by the public service commission to any ' public motor carrier of property,' ' public motor carrier of passengers,' ' contract motor carrier of property or passengers ' or ' private motor carrier of property,' until and after such applicant shall have filed with, and the same has been approved by, the public service commission, a liability insurance policy in some insurance company or association authorized to transact business in this state, in such reasonable sum as the commission may deem necessary to adequately protect the interests of the public with due regard to the number of persons and amount of property involved, which liability insurance shall bind the obligors thereunder to pay compensation for injuries to persons and loss of or damage to property resulting from the negligent operation of such carrier. No other or additional bonds or licenses than those prescribed in this act shall be required of any motor carrier by any city or town or other agency of the state."

mulgate rules relating to the maintenance of vehicle units in a safe and sanitary condition, and making provision as to qualifications and hours of service of operators and for the reporting of accidents. § 22.[12] Violation of the Act or of any order of the commission is made a misdemeanor. § 23.[13]

---

[12] " Sec. 22. The commission shall promulgate and publish in the official state paper, and mail to each holder of a certificate or license hereunder, such regulations as it may deem necessary to properly carry out the provisions and purposes of this act. The commission may at any time, for good cause, suspend, and, upon at least five days' notice to the grantee of any certificate and an opportunity to be heard, revoke or amend any certificate. Upon the commission finding that any public carrier does not give convenient, efficient and sufficient service as ordered, such public carrier shall be given a reasonable time to provide such service before any existing certificate is revoked or a new certificate granted. Any rules promulgated by the commission shall include: (a) Every vehicle unit shall be maintained in a safe and sanitary condition at all times. (b) Every operator of a motor vehicle used as a public carrier shall be at least twenty-one years of age; and every operator of other carriers to which this act applies shall be at least sixteen years of age; and all such operators shall be of good moral character and fully competent to operate the motor vehicle under his charge. (c) Hours of service for operators of all motor carriers to which this act applies shall be fixed by the commission. (d) Accidents arising from or in connection with the operation of carriers shall be reported to the commission in such detail and in such manner as the commission may require: *Provided,* That the failure to report any such accident within five days after the happening thereof shall be deemed willful refusal to obey and comply with a rule of the commission. (e) The commission shall require and every carrier shall have attached to each unit or vehicle such distinctive marking as shall be adopted by the commission."

[13] " Sec. 23. Every carrier to which this act applies and every person who violates or who procures, aids or abets in the violating of any provision of this act, or who fails to obey any order, decision or regulation of the commission, or who procures or aids or abets any person in his failure to obey such order, decision or regulation, shall be deemed guilty of a misdemeanor and upon conviction shall be punished by a fine of not exceeding $500. . . ."

The general situation to which the statute is addressed is thus described by the District Court, 55 F. (2d) at pp. 350, 351: "The State of Kansas has constructed at great expense a system of improved highways. These have been built in part by special benefit districts and in part by a tax on gasoline sold in the State and by license fees exacted of all resident owners of automobiles. These public highways have become the roadbeds of great transportation companies, which are actively and seriously competing with railroads which provide their own roadbeds; they are being used by concerns such as the plaintiffs for the daily delivery of their products to every hamlet and village in the State. The highways are being pounded to pieces by these great trucks which, combining weight with speed, are making the problem of maintenance well-nigh insoluble. The Legislature but voiced the sentiment of the entire State in deciding that those who daily use the highways for commercial purposes should pay an additional tax. Moreover, these powerful and speedy trucks are the menace of the highways."

It is apparent that Kansas, in framing its legislation to meet these conditions, did not attempt to compel private carriers to become public carriers. The legislature did not purport to put both classes of carriers upon an identical footing and subject them to the same obligations. See *Smith* v. *Cahoon,* 283 U. S. 553, 563; *Michigan Commission* v. *Duke,* 266 U. S. 570, 576–578; *Frost Trucking Co.* v. *Railroad Comm.,* 271 U. S. 583, 592. It recognized and applied distinctions. 'Public' or common carriers, and not private carriers, are required to obtain certificates of public convenience and necessity. The former, and not the latter, are put under regulations as to fares and charges. While, with respect to certain matters, both are placed under the general authority given to the public service commission to prescribe regulations, it does not appear from the bill of complaint that any regulation has

been prescribed, or that the commission has made any order, of which private carriers may properly complain. The statute itself, however, does impose certain obligations upon private motor carriers of property, and the first question is whether these provisions violate the constitutional restrictions invoked.

*First.* " Private motor carriers of property " must obtain a license, pay a tax and file a liability insurance policy. The public service commission has no authority to refuse a license if the described information is given with the application, the liability insurance policy is filed, and there is compliance with the regulations and payment of the license fee (§ 8).[14] It is not shown that either regulations or license fees are unreasonable. The tax and the license fees, over the expenses of administration, go to the highway fund of the State for the maintenance and reconstruction of the highways the carrier is licensed to use. The insurance policy is to protect the interests of the public by securing compensation for injuries to persons and property from negligent operations of the carriers. § 21.[15] The District Court approved an earlier decision, also by a District Court of three Judges, that this provision was not intended to require " security for passengers or cargoes carried, but only to protect third persons from injuries to their persons or property." 55 F. (2d) at p. 357; *Louis* v. *Boynton*, 53 F. (2d) 471, 473. This is an admissible construction and no different application of the provision appears to have been made by either the state court or the commission.

Requirements of this sort are clearly within the authority of the State, which may demand compensation for the special facilities it has provided and regulate the use of its highways to promote the public safety. Reasonable regulations to that end are valid as to intrastate

---

[14] See Note 6.     [15] See Note 11.

traffic and, where there is no discrimination against the interstate commerce which may be affected, do not impose an unconstitutional burden upon that commerce. Motor vehicles may properly be treated as a special class, because their movement over the highways, as this Court has said, " is attended by constant and serious dangers to the public, and is also abnormally destructive to the ways themselves." *Hendrick* v. *Maryland,* 235 U. S. 610, 622; *Kane* v. *New Jersey,* 242 U. S. 160, 167; *Michigan Commission* v. *Duke, supra; Interstate Busses Corp.* v. *Blodgett,* 276 U. S. 245, 250, 251; *Sprout* v. *South Bend,* 277 U. S. 163, 169, 170; *Hodge Co.* v. *Cincinnati,* 284 U. S. 335, 337.

Objection to the tax is made on the score of uncertainty, in view of the exemptions of motor carriers operating wholly within a city or village, and of private motor carriers operating " within a radius of twenty-five miles beyond the corporate limits of such city, or any village." § 2.[16]   This objection is distinct from that of unconstitutional discrimination, shortly to be considered. We perceive no uncertainty by reason of the first exemption, which definitely applies to cases of operation exclusively within the limits of a city or village.  As to the second exemption, the state authorities assert, and it is not denied, that in the administration of the Act the public service commission has taken the exemption to mean that "so long as private carriers operate within a radius of twenty-five miles of their home city or base they are not subject to the payment of the fee.  Even though they have made trips outside the twenty-five mile radius, which subjects them to the law and to the payment of tax for such trips, they are still not subject to the payment of a tax for trips made entirely within the

---

[16] See Note 2.

twenty-five mile zone." The District Court expressed the opinion that the provision " can and should be construed as intending· to exempt from the tax those carriers who either have an established place of business or an established delivery point, with trucks domiciled in any city, and that such trucks may operate in that city and within a twenty-five mile radius free of any tax," and the court said that it agreed with the construction of the commission that " if such a truck goes beyond the twenty-five mile limit," " only the excess is taxable." 55 F. (2d) at p. 356. On this construction, it cannot be said that there is a fatal defect in definition. The tax itself is certain, as in the process of laying the tax it is necessarily made certain before any penalty can be imposed for non-payment. The tax is to be assessed and collected on the basis of gross ton miles and this mileage is to be computed in a prescribed manner. When the tax is assessed, the ordinary remedies will be available for contesting it, if the assessment is not in· accordance with the law. No impropriety in assessment or in collection as to these appellants, or denial of remedy, is disclosed. Nor is the amount of the tax, which the State could lay in its discretion for the lawful purposes declared, shown to be unreasonable.

The objection to the authority given to the public service commission " to regulate and supervise the accounts, schedules, service and method of operation," " to prescribe a uniform system and classification of accounts," to require the filing of reports and data, and generally to " supervise and regulate " all the carriers to which the Act applies " in all matters affecting the relationship " between such carriers and " the traveling and shipping public " (§ 5)[17] similarly raises no question which can now be

---

[17] See Note 5.

considered, as there has been no action or threat of action, so far as appears, by the commission giving ground for the contention that the constitutional rights of the appellants have been or will be invaded. This is not a case like that of *Smith* v. *Cahoon, supra,* where the requirements of the statute itself, as distinguished from action of the state commission under it, had such an objectionable generality and vagueness as to the obligations imposed upon private carriers that they provided no standard of conduct that it was possible to know and exposed the persons concerned to criminal prosecution before any suitably definite requirement had been prescribed. In the instant case, the statute itself clearly distinguishes in fundamental matters between the obligations of public and private carriers and places upon the latter certain requirements which the State had power to impose. Whatever uncertainty may exist with respect to possible regulations of the commission will be resolved as regulations are promulgated. If any of these transcend constitutional limits, appellants will have their appropriate remedy. The provision as to keeping records and furnishing reports and information and as to maintaining uniform methods of accounting, may in the case of private carriers of property be assumed, until the contrary appears, to have relation, as the state authorities assert, to the determination of the amount of the tax to which the private carriers are properly liable. The general grant of authority to the public service commission over all the carriers described, including both public and private carriers, in all matters affecting their relationship with the traveling and shipping public, we think should be taken distributively in the light of the context and of the manifest distinctions in the relation of different sorts of carriers to the public. The distinction made by the statute between public and private carriers with respect to the obtaining of certificates of public con-

venience and necessity, and as to rates and charges, indicates the intention to keep separate the special responsibilities of public carriers from the more limited but still important duties which are owing as well by private carriers, in protecting the public highways from misuse and in insuring safe traffic conditions, and there is no reason to conclude that the authority given to the commission will not be viewed and exercised accordingly. We agree with the District Court that the last clause of § 5, providing that " all laws relating to the powers, duties, authority and jurisdiction of the public service commission over common carriers are hereby made applicable to all such motor carriers except as herein otherwise specifically provided," applies to public and not to private carriers.

The duty laid upon the commission (§ 22)[18] to insist that motor vehicles shall be maintained " in a safe and sanitary condition," to prescribe qualifications of operators as to age and hours of service, and to require the reporting of accidents, has manifest reference to considerations of safety. The terms of the statute do not require action by the commission which does not have reasonable relation to that purpose. In this respect, as well as in relation to the other matters above-mentioned, appellants had no right to resort to equity merely because of an anticipation of improper or invalid action in administration. *Smith* v. *Cahoon, supra*, at p. 562; *Dalton Adding Machine Co.* v. *State Corporation Comm.*, 236 U. S. 699, 700, 701; *Champlin Refining Co.* v. *Corporation Comm.*, *ante*, p. 210.

*Second.* The challenged exemptions are set forth in § 2.[19] The first, which excludes from the application of the Act motor carriers who operate wholly within a city or village of the State, has an obviously reasonable basis, as such operations are subject to local regulations. In

---

[18] See Note 12.      [19] See Note 2.

protecting its highway system the State was at liberty to leave its local communities unembarrassed, and was not bound either to override their regulations or to impose burdensome additions.

The second exemption extends only to certain private motor carriers. Under the construction above stated, the exemption provides immunity from the provisions of the Act for carriers of that class who have an established place of business or base of operations within a city or village and operate within a radius of twenty-five miles beyond the municipal limits. The first question is whether the State, in legislation of this sort, may provide for such carriers an exempt zone contiguous to its municipalities. We find no difficulty in concluding that it may. As the District Court pointed out; there "is a penumbra of town" that is outside municipal limits, and delivery trucks, of those having establishments within the municipalities, in their daily routine repeatedly cross these limits "in going back and forth into these outlying additions." The court found that trucks of that class "use the state improved highways but slightly, for the streets of these outlying additions are not generally a part of the state system." The District Court also directed attention to the fact that "the practical difficulty of keeping track of the mileage of such delivery trucks as they cross back and forth is well-nigh insuperable" and that "the revenue to be gained from such use would be insignificant and the cost of collection large." We think that the legislature could properly take these distinctions into account and that there was a reasonable basis for differentiation with respect to that class of operations. In this view, the question is simply whether the fixing of the radius at twenty-five miles is so entirely arbitrary as to be unconstitutional. It is obvious that the legislature in setting up such a zone would have to draw the line somewhere,

and unquestionably it had a broad discretion as to where the line should be drawn. In exercising that discretion, the legislature was not bound to resort to close distinctions or to attempt to define the particular differentiations as to traffic conditions in territory bordering on its various municipalities. *Ohio Oil Co.* v. *Conway,* 281 U. S. 146, 159. This Court has frequently held that the mere selection of a mileage basis in the regulation of railroads cannot be considered a violation of the Federal Constitution. The practical convenience of such a classification is not to be disregarded in the interest of a purely theoretical or scientific uniformity. *Columbus & Greenville Ry. Co.* v. *Miller,* 283 U. S. 96, 101; *Dow* v. *Beidelman,* 125 U. S. 680, 691; *New York, N. H. & H. R. Co.* v. *New York,* 165 U. S. 628, 633, 634; *Chicago, R. I. & P. Ry. Co.* v. *Arkansas,* 219 U. S. 453; *Chesapeake & Ohio Ry. Co.* v. *Conley,* 230 U. S. 513, 522; *St. Louis, I. M. & S. Ry. Co.* v. *Arkansas,* 240 U. S. 518, 521; *Wilson* v. *New,* 243 U. S. 332, 341, 354; *Clark* v. *Maxwell,* 282 U. S. 811; *Chicago, R. I. & P. Ry. Co.* v. *United States,* 284 U. S. 80, 93. No controlling considerations have been presented to overcome the presumption attaching to the legislative action in this case in fixing the radius of the zone for the purpose of establishing an exemption otherwise valid.

The third exemption applies to " the transportation of livestock and farm products to market by the owner thereof or supplies for his own use in his own motor vehicle." In *Smith* v. *Cahoon, supra,* the state statute, which applied to all carriers for compensation over regular routes, including common carriers, exempted from its provisions " any transportation company engaged exclusively in the transporting of agricultural, horticultural, dairy or other farm products and fresh and salt fish and oysters and shrimp from the point of production to the

assembling or shipping point en route to primary market, or to motor vehicles used exclusively in transporting or delivering dairy products." The stated distinction was thus established between carriers, and between private carriers, notwithstanding the fact that they were " alike engaged in transporting property for compensation over public highways between fixed termini or over a regular route." The Court was unable to find any justification for this discrimination between carriers in the same business, that is, between those who carried for hire farm products, or milk or butter, or fish or oysters, and those who carried for hire bread or sugar, or tea or coffee, or groceries in general, or other useful commodities.

The distinction in the instant case is of a different sort. The statute does not attempt to impose an arbitrary discrimination between carriers who transport property for hire, or compensation, with respect to the class of products they carry. The exemption runs only to one who is carrying his own livestock and farm products to market or supplies for his own use in his own motor vehicle. In sustaining the exemption, the District Court referred to the factual basis for the distinction. " The legislature knew," said the court " that as a matter of fact farm products are transported to town by the farmer, or by a non-exempt ' contract carrier ' employed by him. The legislature knew that as a matter of fact the use of the highways for the transportation of farm products by the owner is casual and infrequent and incidental; farmers use the highways to transport their products to market ordinarily but a few times a year. The legislature rightly concluded that the use of the highways for carrying home his groceries in his own automobile is adequately compensated by the general tax imposed on all motor vehicles." 55 F. (2d) at p. 352. And the court properly excluded from consideration mere hypothetical

and fanciful illustrations of possible discriminations which had no basis in the actual experience to which the statute was addressed. The court found a practical difference between the case of the appellants " who operate fleets of trucks in the conduct of their business and who use the highways daily in the delivery of their products to their customers," and that of " a farmer who hauls his wheat or livestock to town once or twice a year." The legislature in making its classification was entitled to consider frequency and character of use and to adapt its regulations to the classes of operations, which by reason of their habitual and constant use of the highways brought about the conditions making regulation imperative and created the necessity for the imposition of a tax for maintenance and reconstruction. As the Court said in *Alward* v. *Johnson*, 282 U. S. 509, 513, 514: " The distinction between property employed in conducting a business which requires constant and unusual use of the highways, and property not so employed, is plain enough." See, also, *Bekins Van Lines* v. *Riley*, 280 U. S. 80, 82; *Carley & Hamilton* v. *Snook*, 281 U. S. 66, 73.

The fourth exemption is " of transportation of children to and from school." The distinct public interest in this sort of transportation affords sufficient reason for the classification. The State was not bound to seek revenue for its highways from that source, and, without violating appellants' constitutional rights, could avail itself of other means of assuring safety in that class of cases.

Appellants also refer to the provision of § 21, with respect to liability insurance, that " no other or additional bonds or licenses " shall be required " by any city or town or other agency of this State." The propriety of this avoidance of a duplication of security is apparent.

*Decree affirmed.*